# United States Court of Appeals

## For the Eighth Circuit

———————————————

No. 24-1379

———————————————

Elias Gipp, through Corrine Kopp, Natural and/or Legal Guardian other Corrine
Kopp; Skylar Gipp; Shayla Gipp, (minor), through Corrine Kopp, Natural and/or
Legal Guardian other Corrine Kopp

*Plaintiffs - Appellants*

v.

Raymond Webb; Gary Sandland, Jr.

*Defendants*

United States of America

*Defendant - Appellee*

————————

Appeal from United States District Court
for the District of North Dakota - Western

————————

Submitted: December 17, 2024
Filed: September 12, 2025
[Unpublished]

————————

Before SMITH, GRUENDER, and STRAS, Circuit Judges.

————————

PER CURIAM.

A federal officer shot and killed George "Ryan" Gipp, Jr. The question is whether the United States is liable for his death under the Federal Tort Claims Act. We agree with the district court[1] that it is not.

I.

Following a turkey hunt with his parents, Ryan fired a shotgun in a gas-station parking lot on the Standing Rock Indian Reservation. After receiving a complaint, two Bureau of Indian Affairs officers pulled the Gipps over a few miles down the road. Ryan, who was under the influence of multiple substances, refused to follow their instructions. When one tried to arrest him, he backed away, balled his fists, and moved into a "bladed stance." After losing sight of Ryan's hands, the officer fired his taser twice.

Tasing Ryan just caused him to run and hide behind the other officer's truck. After a few "quick peeks" at the officers, Ryan fumbled with something in his hoodie pocket and pulled out a shiny black object. Fearing it could be a gun, one of the officers fired his own 17 times. Ryan died later that night.

II.

The Gipps sued the United States for assault, battery, and negligence. Although sovereign immunity typically "shields the [f]ederal [g]overnment and its agencies from suit," *FDIC v. Meyer*, 510 U.S. 471, 475 (1994), the Federal Tort Claims Act makes an exception "for certain torts committed by federal employees acting within the scope of their employment," *Brownback v. King*, 592 U.S. 209, 212 (2021) (citation omitted). As relevant here, it gives federal district courts

---

[1]The Honorable Daniel M. Traynor, United States District Judge for the District of North Dakota.

"exclusive jurisdiction . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Here, the shooting happened in North Dakota, so its law should have applied. *See LaFromboise v. Leavitt*, 439 F.3d 792, 796 (8th Cir. 2006).

The district court went in a different direction. From what we can tell, it interpreted a North Dakota statute immunizing officers who use "necessary and appropriate" force, N.D. Cent. Code Ann. § 12.1-05-07(1); *see id.* §§ 12.1-05-02(1), -05-03, -05-07(2)(d), -05-07.2(1), as coextensive with the Fourth Amendment's reasonableness requirement, *see Graham v. Connor*, 490 U.S. 386, 396 (1989). Although there is reason to doubt whether this approach accurately reflects North Dakota law, both sides waived any argument to the contrary by consenting to it. *See In re Pawn Am. Consumer Data Breach Litig.*, 108 F.4th 610, 614 (8th Cir. 2024) (holding that telling the district court that federal rather than state law applied had invited an error). Given their positions, we will assume without deciding that acting reasonably under the Fourth Amendment is an absolute defense to tort liability in *this* case. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation.").

III.

With that important qualification, we agree with the district court that the record leads to only one possible conclusion: the officers acted reasonably under the circumstances. *See Graham*, 490 U.S. at 396; *Cartia v. Beeman*, 122 F.4th 1036, 1041–43 (8th Cir. 2024) (analyzing each use of force separately). Consider the taser. Before using it, the officers knew that Ryan's actions had already prompted a 911 call. *See Graham*, 490 U.S. at 396 (weighing "the severity of the crime"). They did not know whether he had a handgun, capable of fitting inside his hoodie pocket, or that he had discarded the weapon he fired earlier. Ryan's choice to move into a fighting stance rather than follow their instructions only heightened the risk. In these circumstances, it was reasonable for them to assume that he still posed an

-3-

"immediate threat." *Id.*; *see Cravener v. Shuster*, 885 F.3d 1135, 1140 (8th Cir. 2018) (observing that even "[u]narmed, passively resisting subjects can pose a threat").

From there, the officers did not have a duty to warn him before using the taser. *See Boudoin v. Harsson*, 962 F.3d 1034, 1043 (8th Cir. 2020) (explaining that "warnings . . . are among the *many* factors relevant to determining whether use of a taser amounts to excessive force" (emphasis added) (citation omitted)). And without more, neither minor testimonial "inconsistenc[ies]" in one officer's story,[2] *Smith v. City of Brooklyn Park*, 757 F.3d 765, 774 (8th Cir. 2014) (per curiam), nor the family's police-force expert, *see Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995), could create a genuine issue of material fact on their own.

The record also shows that the use of deadly force was reasonable. By that point, Ryan had already resisted arrest, shaken off two taser shots, crouched behind a truck, and pulled what looked like a gun from his hoodie pocket. *See Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) (recognizing that an officer can "employ[] deadly force to protect himself against a . . . suspect who . . . moves as though to draw a gun" without "wait[ing] until he sets eyes upon the weapon"). The situation had gone from dangerous to potentially deadly as Ryan's actions became increasingly erratic and aggressive. *See Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (explaining that "menacing action" with a gun can justify the use of deadly force (citation omitted)).

Although the Gipps have questioned whether Ryan was holding anything at all, a "genuine issue for trial" requires "more than . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citation omitted). Here, investigators recovered multiple objects at the scene, including a shotgun shell on the ground and a 7.5-inch wrench

---

[2]We grant the joint motion to supplement the record with additional testimony from the officer.

from one of Ryan's pockets.  Even if the officer who shot him made a mistake about what he saw, it was reasonable to confuse one of these items with a gun given his distance, the darkness, and the "tense, uncertain, and rapidly evolving" situation. *Thompson*, 257 F.3d at 899 (citation omitted).  Though shooting Ryan was regrettable, it was reasonable under the circumstances. *See id.* at 899–900.

## IV.

We accordingly affirm the judgment of the district court.

_____